UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAUREN HUGHES, et al.,

                Plaintiffs,

        v.

APPLE, INC.,

              Defendant.

Case No.  22-cv-07668-VC

**ORDER PARTIALLY DENYING AND PARTIALLY GRANTING THE MOTION TO DISMISS**

Re: Dkt. No. 50

       The AirTag is a small, affordable location-tracking device manufactured and sold by Apple. It is marketed as a convenient way to keep track of personal items, like car keys. The AirTag reports its location to its owner's cell phone, so you can simply attach the AirTag to your car keys and then you can use your cell phone to find them. But people do not always use a product as marketed. The thirty-eight plaintiffs in this case allege they were stalked by someone who used an AirTag to follow their location and movements.

       From the beginning, it was obvious that the AirTag would be an especially useful tool for stalkers. So Apple has designed it with features that aim to diminish the ability of stalkers to use it effectively. But the plaintiffs allege that those features are inadequate, and that Apple could and should have done more. They have filed a 131-page class action complaint against Apple, asserting many different legal claims based on Apple's alleged failure to mitigate the dangers created by the AirTag.

       Most of the claims are inadequately pled, and they are dismissed in a separate ruling. But three of the plaintiffs have stated claims for negligence and strict products liability under California law. Those plaintiffs allege that, when they were stalked, the problems with the

AirTag's safety features were substantial, and that those safety defects caused their injuries. This ruling explains why those claims survive, even though it's a close question. Apple may ultimately be right that California law did not require it to do more to diminish the ability of stalkers to use AirTags effectively, but that determination cannot be made at this early stage.

**I**

**A**

This subsection describes and quotes the allegations that two of the California plaintiffs make about their experiences being stalked through the use of AirTags. These allegations must be treated as true for purposes of this motion to dismiss.

On Father's Day weekend in 2022, John Kirkman's estranged wife showed up at his house, banged on the door, rang the doorbell, drove up and down the street honking her horn, and did not leave for several hours. Kirkman had noticed "signs of aggressive and erratic behavior" during the marriage, which made him fear for his safety. Because of that, Kirkman made efforts to keep his estranged wife from discovering where he was living. But she found his new home, and her behavior that day scared and upset both him and his daughter, who was also in the house at the time.

When Kirkman was driving home from work the next day, he saw a notification on his iPad: it informed him that "an unknown AirTag was detected." Since he did not know what that meant, Kirkman looked online "to figure out what an AirTag was and how to locate it." He learned that his daughter had previously received a similar alert when riding in the car with him, but she did not bring it up because she did not know what it meant. Kirkman spent several days searching for the AirTag. "Ultimately, he found one duct-taped to the inside of the rear bumper cover of his vehicle."

Kirkman remains afraid of future AirTag stalking by his estranged wife. He called the police and filed an online report for harassment, but "nothing ultimately came of that." Since the incident, he has "suffered from anxiety," is "unable to relax," feels "constantly on edge," and has "a great deal of difficulty sleeping." He feels the need to remain constantly aware of his

surroundings and to stay up late into the night, to make sure he is not being stalked. He is afraid to leave his home and has difficulty engaging in activities that he previously enjoyed. Put simply, "he doesn't feel like the same person he was a year ago."

In 2021, Àine O'Neill moved to Los Angeles to pursue a career in film and television. She entered the United States on an O-1 artist visa, which took her two years to acquire. After her move, she found a job in the industry, took acting classes, did theater in the park with friends, played tennis, did stand-up, joined a screenwriting group, and enjoyed an active social life.

In late November 2022, O'Neill saw a notification on her phone about an AirTag. She searched her purse and car but did not see one. Then she "tried to get the AirTag to make a sound." Upon hearing a sound coming from her car, but not from inside the car, she concluded the AirTag was likely underneath the vehicle. Then she and her roommate both searched for the device, but neither could track it down. Although O'Neill could not locate the AirTag, her phone showed her everything the AirTag owner could see about her: "where she worked, where she parked her car, her home address, and everywhere she had been." So she "texted with Apple," and Apple "confirmed the existence of the AirTag but informed her that they were unable to disable [the] tag without physical possession."

O'Neill called the police the next morning and made a report. But the police told her that, even though "there's no way that this is anything other than sinister," they "could not help her fully until she had the physical AirTag in hand." O'Neill then "took her car to Pep Boys" for help, but they were also unable to find the AirTag. Then she took the car to another auto shop, which told her that they would have to strip the car to find it. Because she could not afford the price they quoted her, she left.

The stalking destroyed O'Neill's life in Los Angeles. The week after she found the AirTag, she "called in sick to work," "canceled her acting classes and all other plans," and "found herself barely able to get out of bed." O'Neill "sunk into a deep depression." And she was terrified, "peering out through her blinds at all hours," "leaving lights on in her apartment throughout the night," and having panic attacks whenever she was alone in the apartment. The

phone alerts continued for more than a month. O'Neill decided that "she could no longer live in California, as she had no way of revealing the identity of her stalker or properly gauging the level of danger she was in."

So O'Neill moved back to Ireland. She gave up a recently booked recurring acting role on a television series, the money she had been saving to buy a home but was forced to spend on an emergency move, the visa that she had worked so hard for and that she still had a year left on (with plans to try to renew it), and the rest of the professional and personal life she had spent two years building in California. Back in Ireland, she still suffers as a result of the stalking: she feels embarrassed, humiliated, devastated, and afraid.

Kirkman and O'Neill are part of a group of thirty-eight plaintiffs who were stalked with AirTags. Three additional plaintiffs were stalked in California; the rest are scattered across the United States and Canada. The experiences vary, but each plaintiff alleges that their stalker used an AirTag, and that the involvement of the AirTag caused them harm.

B

The AirTag is a small tracking device manufactured and sold by Apple. The user can follow the location of their AirTag through their iPhone. The purpose of the product is to help people keep track of things like keys and purses—if you have an AirTag on your keychain or in your purse, you'll be able to find those items using your phone (which, of course, never leaves your side).

But the plaintiffs allege that the AirTag has also "revolutionized the scope, breadth, and ease of location-based stalking." They point to several features that differentiate the AirTag from other tracking devices on the market: its accuracy, its ease of use, and its affordability. The AirTag allegedly operates via Bluetooth—it "emits signals that are detected by Bluetooth sensors" on other Apple products, and those Apple products then report the AirTag's location. Bluetooth range is approximately thirty feet. And the plaintiffs allege that, in much of United States, "one is never more than 100 yards away from an Apple device." Thus, the AirTag can transmit accurate location data from just about any populated area. Apple product users may be

4

familiar with this Bluetooth sensor system from the "FindMy" network, which Apple also uses to locate devices like iPhones and iPads (either to enable people to share their location with their friends and family, or to find their missing devices). The AirTag works the same way. That leads to the second alleged differentiating feature: the AirTag is easy to use because it fits "seamlessly into Apple's existing suite of products." Finally, the plaintiffs allege that it is affordable, only twenty-nine dollars per device, and small, about the size of a quarter.

Apple released the AirTag in April 2021. The plaintiffs allege that in the run-up to and immediate aftermath of the launch, "advocates and technologists urged the company to rethink the product and consider its inevitable use in stalking." But, the plaintiffs assert, Apple ignored these warnings. When it released the product, Apple touted several "mitigation features that it claimed rendered the devices 'stalker proof.'" And the plaintiffs acknowledge that Apple has implemented a number of safety features aimed at the risk of AirTag stalking—some were operational when the product launched, and some have become newly available or have been improved since launch. But the plaintiffs allege that these safety features are deficient.

Take, for example, the screen alerts. If a device that runs Apple's operating architecture (iOS) "detects an unknown AirTag moving with the device," then the screen will display an alert. The alert is a pop-up text notification, and it is allegedly how Kirkman, his daughter, and O'Neill learned that they were being stalked with an AirTag. The recipient of the alert can also make the AirTag play a sound. And, based on O'Neill's account, it seems that the notification also enables the recipient to see what the AirTag owner can see—but it is not entirely clear from the complaint how this feature works.[1]

---

[1] It is worth noting that the allegations leave a lot of uncertainty about potentially relevant aspects of the product. The screen alerts are one example. What text is displayed to the user, and has that changed over time? What can a user see and do if they click on the alert, and has that changed over time? If a user is able to see what the AirTag has tracked, how far back are they able to look? The plaintiffs' general allegations, combined with the stories of individual plaintiffs, also raise some inconsistencies. That might be a result of imprecise pleading. It might be a result of the features working inconsistently. And it might also be a result of Apple making and testing changes to the safety features. Ultimately, a clearer timeline will be necessary for multiple aspects of the plaintiffs' claims (e.g., when was Apple in breach of a duty to use due care, which features were available when a particular plaintiff was injured, etc.). But, as

The plaintiffs argue that there are numerous issues with these screen alerts. To start, there is allegedly significant delay between the moment the AirTag is detected traveling with the device and the moment the alert shows up. "[T]he timing of the alerts can vary depending on the iPhone's operating system and location settings"—some users report up to a day of tracking before receiving the alert, while Apple "estimates it takes between four and eight hours." And that timeframe is apparently an improvement. The plaintiffs allege that when the AirTag was first released, the notification would not be sent until seventy-two hours after detection. On top of that, many of the plaintiffs report not understanding what the notifications meant when they saw them, suggesting that the phrasing may be confusing or unclear. Additionally, people allegedly cannot trigger a search for an unknown AirTag themselves: they must wait for Apple's system to send an alert. Thus, if the recipient does not immediately act on the notification— either because they do not know what it means or because they are unable to do so at the time they receive it—and it goes away, then the user cannot know when or whether they will receive another notification. For example, one plaintiff alleges that her daughter got a screen alert while they were driving, but by the time they had pulled off the road to search for the device, the alert was gone. Beyond that, the plaintiffs assert that not all Apple product owners can receive these alerts. They are only available for people with iPhones, iPads, or iPod Touches that run iOS version 14.5 or later.[2] Also, if a user disables "Location Services" in their device settings, then the user will not be able to receive the Unknown AirTag screen alerts—but this "consequence" is allegedly not explained to users.

Another feature that the plaintiffs take issue with is the sound alert. The plaintiffs allege that an AirTag will play a "chime-like sound" when it is away from its owner for too long. Again, the noises do not begin immediately—Apple allegedly says they will play within eight

---

discussed below, for certain claims asserted by these California plaintiffs, the complaint has alleged enough to survive the motion to dismiss.

[2] Apple has a different device-based system for alerting Android users. The complaint also alleges serious defects with that system. But since this opinion addresses only the California plaintiffs, and all of them are identified as iOS users in the complaint, those allegations are not presently relevant.

and twenty-four hours of separation from the AirTag's owner. And it's unclear how long the noise will continue, or if it starts and stops in intervals. But the primary issue is with the sound itself: its volume and its distinctiveness. The sound is allegedly around sixty decibels, which the plaintiffs describe as "approximately as loud as a normal conversation between two people, or background music." The plaintiffs allege that "the sound is not particularly distinctive," quoting a reporter who wrote that "the sound was easy to confuse with all the other beeps and boops gadgets make these days." These issues with the sound are particularly problematic, the plaintiffs assert, "if the victim is hearing impaired or in a loud environment, or if the stalker places the AirTag in a place where it will be muffled or out of range of hearing (like the outside of a car)." On top of that, people have apparently discovered how to disable the speaker. The plaintiffs allege that tutorials for deactivating or removing the speaker are easily accessible online, and that modified "silent AirTags" are available for purchase on mainstream e-commerce websites.

The plaintiffs also complain about how difficult it is to deactivate AirTags, alleging they can be deactivated only manually, by removing the battery. This obviously requires physical possession of the actual device. So the stalking victim has to actually locate the unknown AirTag—otherwise, the stalking can simply continue. And deactivation has other downsides. Removing the battery allegedly sends an alert to the AirTag's owner, so they immediately know that the device has been found. Also, the plaintiffs allege that law enforcement agencies have cautioned that tampering with the battery can contaminate the AirTag as evidence.

The plaintiffs argue that these defects render the product too unsafe. The lawsuit includes many different claims and many different theories of liability, but the two strongest ones are common law tort claims for negligence and strict products liability. There is no dispute that the tort claims brought by people who were victims of stalking in California are governed by California tort law. This opinion will discuss the viability of those tort claims. As noted above, a separate ruling addresses the other causes of actions and the plaintiffs who were stalked outside of California.

**II**

The plaintiffs assert that Apple owes AirTag-stalking victims "a duty of care in its design, marketing, and introduction into the market of its AirTags." They allege that Apple breached this duty by "rushing AirTags to market with insufficient safeguards to prohibit their use for stalking purposes." And they allege this caused their injuries. In other words, Apple allegedly breached its duty of care to the plaintiffs by "putting them at an unreasonable risk of harm through the reasonably foreseeable actions of third-party stalkers." Apple contests both the duty and causation elements of the plaintiffs' negligence claims.

**A**

The baseline rule in California is that everyone has a duty "to exercise, in his or her activities, reasonable care for the safety of others." *Kesner v. Superior Court*, 1 Cal.5th 1132, 1142 (2016) (quoting Cal. Civ. Code § 1714(a)); *see also Modisette v. Apple Inc.*, 30 Cal.App.5th 136, 143 (2018). But courts can carve out exceptions to the "broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." *Kesner*, 1 Cal.5th at 1143. The California Supreme Court has emphasized that the question for courts is not whether to create a *new duty*, as Apple characterizes it, but rather, whether to carve off an *exception* to the baseline duty that applies to everyone. *Id.* And courts should create such an exception only when it is "clearly supported by public policy" and when it is possible to "promulgate relatively clear, categorical, bright-line rules of law applicable to general classes of cases." *Id.* at 1143–44. For that reason, the analysis of duty "occurs at a higher level of generality" than the facts of each individual case. *Id.* at 1144. In other words, the duty inquiry examines categories of conduct and categories of potential plaintiffs who allege certain categories of injury. For example, the duties of a landowner to a trespasser. Then the other elements of the tort claim—breach, causation, and injury—must be determined based on the particular facts of the individual case. In other words, whether a particular defendant breached their duty to a particular plaintiff, if that breach caused that plaintiff's harm, and what damages the plaintiff suffered.

The factors that are meant to guide courts in determining whether an exception is appropriate are called the *Rowland* factors, based on the California Supreme Court's discussion of them in *Rowland v. Christian*, 69 Cal.2d 108, 112–13 (1968). The factors are overlapping and vague. Courts often sort them into two different categories based on their focus, with "the first addressing foreseeability and related concepts and the second addressing public policy considerations." *Social Media Cases*, Nos. JCCP5255, 22STCV21355, 2023 WL 6847378, at *24 (Cal. Super. Ct. Oct. 13, 2023). The foreseeability factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection between the defendant's conduct and the injury suffered." *Id.* (quoting *Rowland*, 69 Cal.2d at 113). But even if the plaintiff prevails on the foreseeability factors, courts will still sometimes find that there is no duty if the policy factors counsel otherwise. *Id.* at *26. The policy factors are "the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Id.* at *24 (quoting *Rowland*, 69 Cal.2d at 113). As noted, the analysis of these factors does not occur at the level of the individual incident. So, as applied to this case, the analysis is about whether the manufacturer of a tracking device should be excused from the duty to use reasonable care in the creation, design, and marketing of that device to prevent or mitigate harm from stalking.

As an initial matter, Apple contests the applicability of this framework to the plaintiffs' claims. It argues that the California statutory provision creating the baseline rule imposing a duty of care does not govern the asserted defects with the AirTags. The provision states, in relevant part: "Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary skill in the management of his or her property or person." Cal. Civ. Code § 1714(a). Apple argues that by selling the AirTags to the stalkers, it stepped outside of the provision's scope, because the AirTags were no longer Apple's property. But this argument conflicts with the case that Apple relies on most heavily: *Modisette v. Apple*, 30 Cal. App. 5th 136 (2018).

9

There, the California Court of Appeal ruled that Apple owed no duty to use reasonable care to prevent harm from car accidents caused by drivers who were distracted by their iPhones while driving. This was, of course, a favorable ruling for Apple. But the court reached its ruling by applying the *Rowland* factors to create an exception to section 1714(a)'s general rule; it did not rule that section 1714(a) becomes inapplicable once a company sells its product to a third party. *See id.* at 143–52. Absent strong reason to believe that the California Supreme Court would apply a different framework to the scenario presented here and in *Modisette*, this framework controls. *See In re Watts*, 298 F.3d 1077, 1082–83 (9th Cir. 2002). Apple has not identified case law or other evidence that would suggest a different outcome on this issue at the California Supreme Court.[3] The question, then, is not whether *Modisette*'s framework applies. It is whether the *Rowland* factors absolve Apple of a duty to use reasonable care in its AirTag design to mitigate harm from stalking in the same way they absolved Apple of a duty to use reasonable care in its iPhone design to mitigate harm from distracted driving.

    *Foreseeability of harm to the plaintiff*. The foreseeability of the harm is often described as "the most important factor" in the analysis of whether a duty exists. *Social Media Cases*, 2023 WL 6847378, at *24 (quoting *Kesner*, 1 Cal. 5th at 1145)). Common sense alone compels the conclusion that harm from stalking is a foreseeable consequence of making and selling a tracking device, especially a small, affordable, consumer-friendly tracking device. Similarly, the court in *Modisette* concluded that harm from car accidents caused by cell phone use by drivers was sufficiently foreseeable to support a duty. *Modisette*, 30 Cal.App.5th at 144.

    In analyzing this factor, the *Modisette* court also considered evidence that Apple itself

---

[3] Apple's argument is based on language in some case law stating that there is "no duty to control the conduct of another." *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 435 (1976); *see also In re Deep Vein Thrombosis*, 356 F.Supp.2d 1055, 1066 (N.D. Cal. 2005) (citing *In re Firearm Cases*, 126 Cal.App.4th 959 (2005)). But that is not the plaintiffs' claim here. The plaintiffs are not asserting that that Apple has "a duty to initiate an affirmative program of investigation and sanctioning of wayward" users. *In re Firearm Cases*, 126 Cal.App.4th at 973 n.12. Nor that Apple ought to "control" the stalkers themselves. Rather, the plaintiffs are asserting that Apple has a baseline "duty to use ordinary care in the conduct of [its] business" to avoid causing harm to others. *Id.*

was aware of the risk of harm of distracted driving. *Id.* at 143–44. While that case-specific inquiry seems out of step with the instruction to assess the existence of a duty at a higher level of generality, the plaintiffs here would also prevail on the specifics. The plaintiffs allege not only that Apple should have known about the risks of AirTag stalking but also that it actually did know. The plaintiffs allege both pre- and post-launch warnings from "advocates and technologists" about the dangers its product posed for stalking victims. Contemporaneous news articles suggested that Apple executives were touting the product as "stalker proof." Then, after the product launched, the plaintiffs allege that many articles describing the ease of stalking with AirTags were featured in national news outlets, as were multiple stories of actual AirTag stalking.

Apple asserts that the "specific injuries" that the plaintiffs suffered were not foreseeable. Dkt. No. 53 at 5. Relatedly, Apple argues that, since it implemented some safety measures, the Court should be asking whether stalking *despite the safety measures* was foreseeable. *See, e.g.*, Dkt. No. 62, Hearing Transcript at 6:16–17:9. But the duty question is more general than that—it is whether the "category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced." *Kesner*, 1 Cal.5th at 1145. Whether Apple's conduct renders it liable for specific injuries experienced by certain stalking victims is an individual, case-level question. Apple may ultimately be right that some of the thirty-eight plaintiffs experienced unforeseeable harms (certain actions by the stalker, perhaps, or damage to property). But that goes to proximate cause, not duty. Similarly, Apple may ultimately be right that it took due care in making the product safe for stalking victims. But that goes to breach, not duty. It is enough to say that severe emotional distress as a result of being stalked by AirTags was foreseeable.

*Certainty of injury*. This factor includes considerations about "the degree of certainty that the plaintiff suffered injury" and "concerns about the existence of a remedy." *Kesner*, 1 Cal.5th at 1148. The plaintiffs allege they suffered emotional distress from the AirTag stalking. Apple responds that this factor can support the existence of a duty only where the injuries alleged are physical. It invokes a footnote from *Modisette* that commented that "the certainty of injury factor

has been noted primarily, if not exclusively, when the only claimed injury is an intangible harm such as emotional distress." *Modisette*, 30 Cal. App. 5th at 145 n.7 (quoting *Kesner*, 1 Cal. 5th at 1148). But all this means is that the certainty-of-injury factor doesn't come up when the alleged injury is physical; it tends to come into play only when the alleged injury is emotional. Certainly, there are some situations where it will be difficult to assess whether an alleged emotional injury is genuine. *See Billy v. Arthur Young & Co.*, 3 Cal.4th 370, 421 (1992) (Kennard, J., dissenting). And in those situations, the certainty-of-injury factor can cut against finding a duty, as courts are concerned about opening the floodgates to insincere claims, and thus overdeterring socially useful conduct. But serious emotional harm is a likely result of being stalked. So the risk of an influx of unbothered stalking victims seeking tort recovery seems fairly low. Overall, this factor does not favor either side.

*Closeness of the connection between the defendant's conduct and the injury suffered.* This factor assesses how close the connection was between the defendant's conduct and the plaintiff's injuries. Case law is clear that the involvement of a third party in causing the injury does not preclude finding a duty of care: "One's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct . . . of a third person." *Modisette*, 30 Cal. App. 5th at 145 (quoting *Kesner*, 1 Cal. 5th at 1148). But the third party's involvement is one layer of attenuation between the conduct and the injury. So, in applying this factor, courts will consider how many other layers of attenuation are present.

In one case, the California Supreme Court held that a company had a duty to family members and cohabitants of employees who were exposed to asbestos when the employees returned home. *Kesner*, 1 Cal.5th at 1156. In another case, the California Supreme Court found a duty where "a police officer motioned a speeding motorist to stop in the center median of a highway," at which point the motorist's car was struck by a third party, seriously injuring the passengers. *Modisette*, 30 Cal. App. 5th at 146 (citing *Lugtu v. California Highway Patrol*, 26 Cal.4th 703 (2001)). But the court in *Modisette* found that this factor counseled against a duty.

Unlike the employer's use of the asbestos, and the cop telling the driver to pull over, Apple's design of the iPhone "did not put the danger in play"—rather, the design "simply made [the third party's] use of the phone while driving possible, as does the creator of any product (such as a map, a radio, a hot cup of coffee, or makeup) that could foreseeably distract a driver using the product while driving." *Id.* Apple argues that the same logic applies in this case; the AirTag's design simply made the stalking possible—it did not put the danger of stalking into play.

There is certainly real attenuation here, and this factor does cut somewhat against finding a duty, but not to the extent that Apple tries to claim. For one, the plaintiffs have detailed factual allegations about harm from being stalked with a location-tracking device specifically, as opposed to in person or over social media. They allege fear of driving, not thinking anywhere is safe, and not knowing how to protect themselves. A car accident caused by someone looking at a phone is roughly the same as a car accident caused by someone looking at a map. But according to the allegations in this case, the product causes a particularly devastating harm. For another, the connection between the purpose of the product and the harm to the third parties is closer than in *Modisette*. A smartphone serves a great multitude of functions, one of which is video calls, and it's only incidental to any of those functions that a user would be distracted and crash their car. But the sole function of a tracking device is to track location—and the injuries arise directly from the tracking device performing that function. So it is not obvious that Apple did not, in a sense, "put the danger in play."

Additionally, there are fewer links in the chain of causation in this case, as compared to *Modisette*. There, the driver needed to choose to look at his iPhone, he needed to choose to use FaceTime, he needed to be driving in a manner that caused him to fail to see a hazard on the road, he needed to be driving such that he would be in an accident because of that hazard, the other party needed to be unable to avoid the accident, and then there needed to be injuries resulting from the accident. Here, it is simpler. Apple put out a product that would be used for stalking, and it was in fact used for stalking. The stalker has to choose to use the AirTag for stalking, and then injury results. Thus, overall, this factor weighs against finding a duty, but far

13

less strongly than in *Modisette*.

Considered altogether, the foreseeability-related factors weigh against creating an exception to the general duty rule. Next come the public policy factors.

*Moral blame attached to the defendant's conduct*. California courts have "previously assigned moral blame, and [ ] have relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue." *Kesner*, 1 Cal.5th at 1151. Both are true here. Victims of stalking have little to no power over the mechanisms their stalkers use. But the maker and seller of a product that is particularly useful to stalkers does have power over that product. And while stalking victims are not unsophisticated as a general matter, the public is largely unsophisticated when it comes to how tracking devices work and what they can do to protect themselves. Moreover, in assessing this factor, courts have also considered whether the defendant "benefitted financially" from its conduct. *Id.* And Apple profits from all sales of AirTags—whether the sale is to someone who later uses it to track their car keys, or to track a human being without their consent. Thus, this factor weighs in favor of finding a duty.

*Policy of preventing future harm*. The existence of a duty is certainly supported by the state's policy of preventing future harm. "The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible." *Kesner*, 1 Cal.5th at 1150. However, "for a category of negligent conduct," that overall policy may be "outweighed" if there are "laws or mores indicating approval of the conduct." *Id*. Apple does not note any laws or mores in support of its conduct. And there is good reason to believe that imposing liability for negligence in the design, marketing, and sale of location trackers would prevent future harm—the manufacturers of tracking devices are in the best position to engage in conduct that promotes the product's safe use. *Cf. id.* (considering whether there is a future benefit to imposing liability). Similarly, in *Modisette*, the court concluded that the policy of preventing future harm supported the (ultimately unsuccessful) argument that Apple had a duty in the context of iPhones distracting drivers. 30 Cal. App. 5th at

145.

*Extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with the resulting liability for breach*. This factor, which considers the burden on the defendants and broader society of imposing a duty to exercise due care, is perhaps the most important of the policy factors. *See Kesner*, 1 Cal.5th at 1144. It was a key reason the *Modisette* court found an exception to the duty rule. The *Modisette* court ultimately concluded that putting the burden on cell phone manufacturers to design phones to prevent or reduce distraction while driving would go too far. The court quoted from another opinion, which compared the phone manufacturers to a "cosmetic manufacturer or map designer," suggesting that a duty in this case would extend similarly to the makers of all products that might be distracting to a driver. *Modisette*, 30 Cal. App. 5th at 149. The *Modisette* court also looked at state policy, finding it relevant that California permitted drivers to use cell phones in the car under certain circumstances, and even encouraged drivers to use their cell phones while driving to do things like report accidents to the authorities. *Id.* at 150. Finally, the *Modisette* court emphasized just how prevalent cell phones are in modern society, quoting the United States Supreme Court's observation that cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

But each of those considerations from *Modisette* comes out differently in this case. First, there is no similar spillover effect to other kinds of products (as with other driving distractions), and there is no similar precedent for rejecting a duty of care for products that are effective tools for stalking (as with the cases rejecting a duty for distracting drivers). Second, there is no state policy permitting or encouraging, in certain circumstances, individuals to track other people's locations without their consent. Stalking is, of course, illegal. The plaintiffs have also pointed to laws emphasizing California's general policy commitments to personal privacy. Apple could note that California has not chosen to ban tracking devices, which have existed for a long time, nor has it barred AirTag itself, which has been on the market for a few years now. But that

absence of action is a far cry from the affirmative policy statements that the court found meaningful in *Modisette*. Finally, Bluetooth trackers are not nearly as central to everyday life as cell phones. Apple emphasizes the useful, legal functions that AirTags do serve. Dkt. No. 62, Hearing Transcript at 28:23–29:1. There is no dispute that the AirTag is a useful tool for keeping track of items, but its societal value obviously pales in comparison to that of a cell phone.

At the hearing, Apple urged the Court to take an even broader view, looking at the societal importance not only of the tracking chip itself but also of the entire "FindMy" network. *Id.* at 29:7–15; 29:25–30:14. Apple asserted that the FindMy network—which is the Bluetooth network generated by iPhones and iPads that the AirTags operate by tapping into—provides people with the ability to see whether their "child is going to school" or whether their "family members are safe." *Id.* at 30:1–3. Just as the *Modisette* court looked beyond Facetime to the cell phone, Apple urges that this Court look beyond the tracking device that caused the injuries in these cases to the entire location-tracking "ecosystem." *Id.* at 30:9. But that broader lens was made appropriate by the fact that the duty that the plaintiffs hoped to impose in *Modisette* would have broadly burdened cell phone manufacturers. There is no similar theory for why imposing a duty on the maker of a Bluetooth location-tracking device would burden Apple's overall location-tracking system generated by its other, multifunctional products. Based on the description of the technology in the complaint, Apple could cease manufacturing AirTags today and the rest of the FindMy system would still function just the same.[4]

In the end, most of Apple's arguments for why it does not have a duty to use due care boil down to different versions of "but we implemented sufficient safety measures in the AirTags." It may ultimately be that Apple will not bear liability for any of these injuries, either because it did in fact take due care in designing the AirTag, or because its safety measures were effective enough that the product design cannot be said to have caused the injuries. But that

---

[4] Apple may have meant that a duty to take due care to prevent stalking would burden them not only with regard to the AirTag product but also with regard to other Apple products—products that also perform location tracking. But this ruling is not about those products. And all of the *Rowland* factors, not just this one, could come out differently as applied to a different product.

misunderstands the duty inquiry. If a party could avoid a finding of a duty of care by asserting that it did indeed take due care, the whole exercise would break down. The question at the duty stage is whether it's appropriate to excuse a party engaged in a certain category of conduct—the making, marketing, and selling of a location-tracking device—from having a baseline duty to use reasonable care to avoid causing a certain kind of injury—emotional distress and other harms resulting from stalking with the device. Whether each individual case in that category will meet the rest of the elements for a negligence claim is a different question.[5]

B

Apple also argues that the plaintiffs do not adequately allege that the purported breach, putting AirTags on the market without sufficient safety mechanisms, proximately caused the injuries experienced by the stalking victims.

It is certainly true that the intentional acts of third-party wrongdoers can cut off the chain of causation. However, "a third party's conduct is a superseding force cutting off the defendant's liability only if it was unforeseeable and the injury it caused was unforeseeable." *Huang v. The Bicycle Casino, Inc.*, 4 Cal. App. 5th 329, 348 (2016); *see also Soule v. General Motors Corp.*, 8 Cal.4th 548, 573 n.9 (1994) (holding that "the defense of 'superseding cause' . . . absolves a tortfeasor, even though his conduct was a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible"); *Perez v. VAS S.p.A.*, 188 Cal. App. 4th 658, 685 (2010) (noting that "product

---

[5] It is worth noting that neither the plaintiffs nor Apple define the appropriate level of generality for the duty inquiry. One can imagine other ways of defining the category of defendants and their relevant conduct: maker of a Bluetooth location-tracking device, maker of a small and affordable location-tracking device, maker of a device that also tracks location. And the same is true of the level of generality of the injury. Understandably, courts applying the *Rowland* factors also often slip between the general and the more-case-specific, as the *Modisette* court did. All of which demonstrates that this duty inquiry is often imprecise. Some slippage is inevitable. But the force of the conclusions mostly do not hinge on particular nuances of the appropriate level of generality. And to the extent that they do, it is the party seeking the exception to the baseline rule of a duty to avoid harm that bears the burden of defining the exception that it seeks. Apple did not offer a categorical exception—it merely argued that it did not have a duty.

17

misuse may serve as a complete defense when the misuse was so unforeseeable that it should be deemed the sole or superseding cause" (internal quotations omitted)).

The proximate cause inquiry bears a strong resemblance to the duty inquiry: courts are meant to consider the connection between the conduct and the injury, as well as any public policy reasons to limit liability. *Modisette*, 30 Cal. App. 5th at 153. At the general level, both of those considerations have already been thoroughly discussed. But the proximate cause inquiry involves a more specific drill-down: Have the five plaintiffs who were stalked in California plausibly alleged that the product defects caused their injuries? *See Social Media Cases*, 2023 WL 6847378, at *29. Unlike duty, proximate cause is typically "a question of fact which cannot be decided as a matter of law from the allegations of a complaint" unless "the facts are such that the only reasonable conclusion is an absence of causation." *Modisette*, 30 Cal. App. 5th at 152 (quoting *State Department of State Hospitals v. Superior Court*, 61 Cal.4th 393, 353 (2015)). Although the complaint certainly could have done a better job of tying each plaintiff's story to the alleged defects, the allegations of causation for four of the five California plaintiffs are sufficient to survive a motion to dismiss.

John Kirkman's allegations involve several of the purported defects. He alleges that, despite trying to hide the location of his new home from his estranged wife, she managed to find the house and to terrorize him and his daughter. The complaint raises an inference that she was able to locate the home through the use of the AirTag, but it was not until the day after the incident that Kirkman first received a device notification. Additionally, although both Kirkman and his daughter allege that they received device notifications, neither of them understood what the notifications meant, suggesting issues with the clarity of the notification text. Finally, it allegedly took several days for Kirkman to find the AirTag and remove it—had the sounds been louder or more distinctive, or had Kirkman had the ability to trigger the sound himself, he could have found it earlier. Those additional days where Kirkman was searching amounted to additional time being stalked, during which his estranged wife was allegedly able to see everywhere that he took his car and identify places that he might go in the future.

In Àine O'Neill's case, the allegations make it clear that the screen notification did not arrive until after the stalker had discovered a great deal about her: "where she worked, where she parked her car, her home address, and everywhere she had been." Several asserted defects with the product—inadequate noise volume and insufficiently precise tracking—prevented O'Neill from ever finding the product to trace it back to her stalker. Another asserted defect—inability to disable the device remotely—prevented O'Neill from being free of the stalking while she still had her car.[6]

Hollye Humphreys's ex-husband allegedly hid an AirTag in the backseat of her car. She alleges that she received device notifications for three days, but she ignored them because "she was unfamiliar with AirTags and did not know what the alert meant." On the third day, Humphreys received the notification while she was "off work," and "this time" she "was able to activate the beeping sound," which she used to locate the device. And it was only through her online research that she discovered how to reveal the last four digits of the AirTag owner's phone number and was able to confirm that it was her ex-husband. A number of the asserted defects are implicated in Humphreys's story: the sound alerts did not begin on their own, and the sporadic and unclear notifications prolonged the stalking.

However, for one California plaintiff, it is not sufficiently clear from the complaint that Apple's alleged breach was the cause of his injuries. Roger Derick Hembd alleges that his wife repeatedly hid AirTags in his son's belongings. He describes one incident in March of 2022, in which he received the AirTag notification during a visitation with his son. He then contacted his

---

[6] Apple argues that the Court "lacks jurisdiction" over the claims from O'Neill because she is now a resident of Ireland, even though she was injured while residing in California. The two cases that Apple cites are both not about jurisdiction and not applicable. The first, *Edgar v. MITE Corp.*, is a U.S. Supreme Court case that held a state law invalid for burdening interstate commerce based, in part, on the conclusion that protecting nonresident shareholders is not a legitimate state interest. 457 U.S. 624, 644 (1982). The second, *Ministry of Health, Province of Ontario, Canada v. Shiley Inc.*, is a California federal district court case dismissing a products liability action brought by Canadian plaintiffs against a California manufacturer for *forum non conveniens*. 858 F. Supp. 1426 (C.D. Cal. 1994). Notably, *Shiley* found that the court did have jurisdiction over the claims, it just concluded that Canada was the appropriate forum for the claims to be adjudicated. *See id.* at 1431. Thus, there is no apparent jurisdictional issue with O'Neill's claims.

attorney, who contacted his wife's attorney, who apologized on behalf of his wife. *Id.* Months later, in September of 2022, during another visitation with his son, he allegedly heard a "faint beeping noise." After searching for the source of the noise, he found an "altered seam" in his son's Batman doll. He tore the seam and found an AirTag—which he discovered was associated with the last four digits of his wife's phone number. He filed a police report, the district attorney brought charges, and a criminal matter was opened; he was also accepted into a confidential address program administered by the California Secretary of State's office. Hembd alleges severe emotional distress following the September 2022 incident and as a result of the AirTag stalking. But the complaint does not sufficiently connect any of the asserted safety defects— Apple's alleged breach—to Hembd's injury. The plaintiffs do not appear to be arguing that selling a tracking device is always a violation of the duty of care. And based on the allegations, the safety mechanisms seem (roughly) to have worked in Hembd's case. The plaintiffs have not done enough to draw the connection in the complaint, and thus, they have not adequately alleged that Apple was the proximate cause of Hembd's injuries.

For another California plaintiff, the allegations about the role that the AirTag played in the stalking are too vague. Pamyla Luan was asked by her friend to help him move out of his home after a breakup and find somewhere else to stay for the short term. Luan gave her friend, and his belongings, a ride to a hotel. "While she was meeting with her friend, she received a notification on her iPhone that an unknown AirTag was traveling with her." But Luan alleges that neither she nor her friend "understood the significance of the alert." It allegedly took another two and a half months before Luan and her friend "found 2 AirTags hidden among her friend's belongings"—the same belongings that Luan had put in her car. But removing those AirTags did not end Luan's ordeal. She alleges that she was stalked for a year by her friend's ex-girlfriend, who repeatedly "sent threatening messages" that "indicated that she was still tracking Luan and her friend." The stalker then allegedly took extreme action that further harmed Luan (for example, illegally obtaining compromising photographs and sending them to Luan's family, and sending strangers to Luan's home to harass her). It is clear that Luan alleges serious injuries as a

result of the actions of the woman who stalked her. But it is not clear how the AirTags—or the asserted safety defects—fit into that narrative. Thus, the plaintiffs have not done enough to show that Apple's alleged breach was the proximate cause of Luan's injuries.

Apple's own arguments about proximate cause echo its arguments about duty. It relies on *Modisette*, which found that no reasonable jury could conclude from the complaint that Apple caused the injuries to the Modisettes that resulted from a car accident in which the driver was distracted by FaceTime. *Modisette*, 30 Cal. App. 5th at 154. The *Modisette* court, in turn, relied on multiple cases in which other courts had found that a car accident was not proximately caused by a product that distracted the driver. *Id.* at 154–55. But as discussed above, there are meaningful differences between the iPhone to car accident connection and the AirTag to stalking connection. Those differences are no less prevalent at the case-specific level. And the car accident precedent that compelled the *Modisette* court is less applicable to these facts.

Ultimately, "to the extent that [Apple] can be understood to make the argument that it is unclear from these factual allegations *to what extent* [the AirTag and its defects] caused the specific harm suffered by one of the individual plaintiffs, [Apple] raise[s] a factual argument that must be addressed at a later stage of the litigation." *Social Media Cases*, 2023 WL 6847378, at *30. That will be a significant question, and a heavily fact-bound one. It is also an inquiry that seems to vary substantially among plaintiffs. This opinion addresses only five of the thirty-eight plaintiffs who were joined in this action, and it analyzes those claims under only one state's tort law regime—even still, meaningful plaintiff-specific nuances arise in the proximate cause discussion. These issues do not warrant dismissal at the pleadings stage for the plaintiffs who have each stated a claim.

### III

The plaintiffs also assert claims for strict products liability. They allege that Apple put a product with safety defects on the market, and that its safety defects caused the plaintiffs' injuries. Apple argues that these strict products liability claims fail as a matter of law. First, it asserts that strict products liability cannot apply to these claims due to the nature of the plaintiffs'

alleged injuries. Second, it contends that under both tests used to determine whether a product is "defective" in strict products liability, the plaintiffs' claims fail as a matter of law.

### A

In strict products liability, "a manufacturer is strictly liable in tort when an article he places on the market . . . proves to have a defect that causes injury to a human being." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1054 (N.D. Cal. 2014) (quoting *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal.3d 987, 994 (1991)). That rule supplies the duty and breach elements of a tort claim, leaving only causation and damages. Since the plaintiffs' negligence claim is largely based on alleged product defects, the causation analysis comes out the same way for both claims. *See Modisette*, 30 Cal. App. 5th at 142. Thus, the key question is whether it is appropriate to apply strict products liability to these allegations.

Apple argues that strict products liability applies only to allegations of "physical harm to person or property," and thus does not cover the emotional distress and psychological harm alleged by the plaintiffs. In support of this assertion, Apple cites cases describing California's economic loss rule. *Jimenez v. Superior Court*, 29 Cal.4th 473, 481–84 (2002); *Opperman*, 87 F. Supp. 3d at 1054–55. The purpose of the economic loss rule is to maintain the "distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss." *Jimenez*, 29 Cal.4th at 456. Tort law makes a manufacturer strictly liable for personal injuries caused by the product. But the law regarding warranties governs "the level of performance of [the] products in the consumer's business." *Id.* Thus, damages like "inadequate value" and "costs of repair and replacement of the defective product or consequent loss of profits" are insufficient to state a products liability claim. *Id.* Moreover, vague and nonspecific allegations of damages—for example, just asserting "personal injury" or "invasions of [ ] privacy"—will also be inadequate. *Opperman*, 87 F. Supp. 3d at 1054–55.

Apple's reliance on the economic loss rule is question-begging. Apple is invoking a doctrine that draws a distinction between economic harm and physical harm to argue that there must also be a distinction between emotional harm and physical harm. One does not follow from

the other. Tort law often uses the term "physical harm" to distinguish from economic harm, and it has been doing so for a long time. But that only begs the question of how emotional harm should be treated. Indeed, emotional harm and physical harm are equally distinct from economic harm, so the economic loss rule should have nothing to say about whether a plaintiff can recover for emotional harm in a strict products liability case. If there is some other doctrine that precludes the vindication of an emotional injury in a products liability case, Apple hasn't cited it. And so the Court cannot dismiss the plaintiffs' strict product liability claims on this basis.[7]

**B**

California recognizes two different tests for determining whether a product is defective: the "consumer expectations test" and the "risk-benefit test." The consumer expectations test asks whether the products performance is so unsafe "that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers." *Johnson v. United States Steel Corp.*, 240 Cal. App. 4th 22, 32 (2015) (quoting *Soule*, 8 Cal.4th at 569). That test is "rooted in theories of warranty," as "implicit in a product's presence on the market is a representation that it is fit to do safely the job for which it was intended." *McCabe v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002). This test is a poor fit for the plaintiffs' claims. The asserted issue with the product is not that it is unsafe for the purchasers—the issue is that it is unsafe for people the purchasers hurt by using the product to perform its one function (location tracking).

Moreover, the consumer expectations test is inappropriate for certain complex products if "the circumstances of the product's failure" do not themselves "permit an inference that the product's design performed below" the reasonable safety expectations of consumers. *Marmont v. Bernzomatic Corp.*, No. 16-cv-848-JAK, 2018 WL 6252500, at *16 (C.D. Cal. July 31, 2018)

---

[7] There is also cause for skepticism that California courts would categorically bar product liability recovery for pure emotional distress injury. Imagine a manufacturer sells a virtual reality headset designed for meditation. And imagine that a product defect causes the headset to glitch, resulting in the display of violent and disturbing images that cause serious anxiety for the user. If all the other elements for a products liability claim were present, it is difficult to believe that tort recovery would be barred. But even if that were the appropriate result under California law, that result is certainly not compelled by the economic loss doctrine—which is all that Apple has pointed to.

(quoting *Demara v. Raymond Corp.*, 13 Cal. App. 5th 545, 559 (2017)). And the circumstances of the stalking incidents are not enough to demonstrate defects with the AirTag itself. Rather, issues like the inability of iPhone owners to initiate a scan for AirTags, or the requirement of physical possession to disable the AirTag, will require an investigation into the technology. This is a situation in which an ordinary consumer "would have no idea how safe the product could be made." *McCabe*, 100 Cal. App. 4th at 1121 (quoting *Soule*, 8 Cal.4th at 562). For both of these reasons, the risk-benefit test is a better fit, and, for these asserted product defects, the consumer expectations test is unavailable as a matter of law. *Cf. Marmont*, 2018 WL 6252500, at *17.

Under the risk-benefit test, products "may be defective if the design embodies an excessive preventable danger." *McCabe*, 100 Cal. App. 4th at 1121. In other words, the factfinder will ask whether the "risks of the design outweigh its benefits." *Id.* The plaintiff has the initial burden of demonstrating that the design was the proximate cause of their injuries. After that, "the burden shifts to the defendant to establish that the benefits of the challenged design, when balanced against such factors as the feasibility and cost of alternative designs, outweigh its inherent risk of harm." *Id.* Apple argues that the plaintiffs have not stated a strict products liability claim that can be adjudicated under the risk-benefit test because "they do not plead the existence of a feasible alternative design." But the burden is not on the plaintiffs to identify what cost-justified measures Apple could have taken to cure the defects. That makes sense—that information is typically in the hands of the manufacturer, not the party injured by the manufacturer's product. Additionally, the plaintiffs have actually identified a number of things that they think that Apple could do to make the product safer. Throughout the briefing for the motion to dismiss, Apple asserts that it has made the product as safe as reasonably possible, that it has been innovating and adding features as problems have occurred, and that the safety features make it unforeseeable that people are harmed by AirTag stalking. Under the risk-benefit test, Apple will have a chance to demonstrate all of that.

## IV

The motion to dismiss is denied with regard to the negligence claims and risk-benefit

products liability claims asserted by Kirkman, O'Neill, and Humphreys. The same claims brought by Hembd and Luan are dismissed with leave to amend. As noted in the accompanying order, the rest of the plaintiffs' claims are also dismissed with leave to amend. Discovery may move forward immediately on the surviving claims. Any amended complaint is due within 21 days of this ruling.

**IT IS SO ORDERED.**

Dated: March 15, 2024

VINCE CHHABRIA
United States District Judge