**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

LAUREN HUGHES, et al., )
)
Plaintiffs, )
)
v. ) **No. 3:22-cv-07668-VC**
)
APPLE INC., )
)
Defendant. )
___________________________________)

San Francisco, California

Thursday, March 5, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

Wade Kilpela Slade LLP
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
**BY: DAVID F. SLADE, ATTORNEY AT LAW**

Wade Kilpela Slade, LLP
2450 Colorado Ave, Suite 100E
Santa Monica, CA 90404
**BY: COLLINS KILGORE, ATTORNEY AT LAW**
**MARC CASTANEDA, ATTORNEY AT LAW**

(Appearances continued on following page.)

REPORTED BY: April Wood Brott, CSR No. 13782
Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

**BY: TIFFANY CHEUNG, ATTORNEY AT LAW**

**Thursday - March 4, 2026** **9:30 A.M.**

**P R O C E E D I N G S**

**---o0o---**

**THE COURTROOM DEPUTY:** All rise. Court is now in session, the Honorable Vince Chhabria presiding.

Please be seated.

**THE COURT:** Very sorry for the delay. Elon Musk took up my parking spot. Just kidding.

That's a joke, if there are any reporters listening.

**THE COURTROOM DEPUTY:** Now calling Civil Case 22-7668, Hughes, et al. vs. Apple Inc.

Will counsel please come forward and state your appearances for the record, starting with the plaintiff.

**MR. SLADE:** Good morning, Your Honor. David Slade of Wade Kilpela Slade on behalf of the plaintiffs, and I'm joined by my colleagues Collins Kilgore and Marc Castaneda, also of Wade Kilpela Slade.

**THE COURT:** Good morning.

**MS. CHEUNG:** Good morning, Your Honor. Tiffany Cheung of Morrison Foerster on behalf of Defendant.

**THE COURT:** Good morning.

Okay. Let's start with the sealing issue. I received the response to the order to show cause why Apple and its counsel should not be sanctioned for the grossly overbroad sealing request, and I guess I was a little confused about your

response.

In your response, you cited a ton of cases where courts have said it's okay to seal stuff whose disclosure would create a competitive disadvantage for the company. You cited -- I think you probably cited, like, 20 cases, right, that stand for the proposition that it's okay to seal materials if the disclosure of those materials would create a competitive disadvantage for the company.

And then you further said, "But we understand that the Court believes that our sealing request was overbroad, and we'll do -- we'll try to go back and narrow it."

And so it sounded to me like what you were saying in your response to the order to show cause is "We believe that these materials, if they were disclosed, would create a competitive disadvantage for Apple, and we're sorry that you disagree, and we'll narrow our sealing request."

And I guess my reaction to that was one of extreme confusion, because I don't think there is any objective argument -- I don't think there is any reasonable argument that most of these materials you've tried to seal, that most of these materials that you've attempted to conceal from the public, would, if disclosed, create some sort of competitive disadvantage for Apple.

So for example, I'm just looking at the first paragraph of the plaintiffs' reply brief, right? And I'll -- just most of

it is redacted, right? And most of it, Apple is requesting that it be sealed. So I'm just going to read the first paragraph of the plaintiffs' reply brief, and I want you to stop me when you think I'm starting to read something that would create some sort of competitive disadvantage for Apple. Please, let me --

**MS. CHEUNG:** Sure, sure.

**THE COURT:** -- do it. Okay?

**MS. CHEUNG:** Yes.

**THE COURT:** "Apple sells a product that it knows" -- and stop me any time.

"Apple sells a product that it knows will be used to stalk people, and it designed the AirTag's unwanted tracking safety features in a way that would only deter as opposed to prevent malicious use."

And "deter as opposed to prevent malicious use" is a quote from somebody from Apple, right?

"But Apple does not view people being hunted as an engineering or business failure; rather, it sees it as a press problem."

And then this -- the following is a lengthy sentence redacted entirely, and Apple has asked to seal it:

"An email to Tim Cook sent only weeks after the AirTag's release bemoans a Washington Post article on the AirTag," quote -- this is quoting the email from an Apple person to Tim

Cook -- quote, "'declaring it a new means of inexpensive effective stalking,'" unquote.

"But rather than taking the reporter's concerns to heart, the email ends on the following note," quote, "'At this time, we are not seeing this narrative gain steam in the media or on social, but we are carefully monitoring as media continued to review AirTag around the world,'" unquote.

Again, stop me when you think any of this is going to create a competitive disadvantage for Apple.

"Publicly, Apple claims that stalking incidents are rare, but internal emails acknowledge that Apple," quote, "'should have consulted domestic abuse organizations on the unwanted tracking policy before shipping, and from these organizations' point of view, this is not a rare event,'" unquote.

"Apple should also know that this is not a rare event. From April 20th, 2021, to April 5th, 2024, Apple received over 40,000 stalking reports, over 1,000 complaints per month on average."

So how -- I mean, I'm -- I think it's obvious that none of that, the disclosure of not a word of that would create any sort of competitive disadvantage for Apple. Perhaps it's embarrassing to Apple, but of course, embarrassment is not a sufficient basis to conceal materials from the public.

So I'm left really not understanding your response to the order to show cause why Apple and counsel should not be

sanctioned for this grossly overbroad sealing request. Can you please explain it to me?

**MS. CHEUNG:** Yes, Your Honor. And I appreciate the opportunity to explain, and I wanted to clarify our response because I think as you've summarized it, that was not the message that we intended to give. So I appreciate the opportunity to clarify.

First of all, I do apologize for the overbroad sealing requests. We do acknowledge that those original sealing requests were, in fact, overbroad. And I take responsibility for those overbroad sealing requests. So I did want to make clear absolutely that we apologize for that.

**THE COURT:** Well, but you say you take responsibility for it, but, I mean, surely this is partly a product of client pressure.

**MS. CHEUNG:** I do -- I am the lead partner on this matter, Your Honor --

**THE COURT:** I understand --

**MS. CHEUNG:** -- and I --

**THE COURT:** -- you're the lead partner on it, but corporate clients put a lot of pressure on their lawyers to seal stuff that shouldn't be sealed, and the lawyers certainly have a responsibility to push back against their clients --

**MS. CHEUNG:** I agree.

**THE COURT:** -- and refuse to seal stuff that has no

business being sealed. And, you know, you lawyers who work for companies like Apple make a lot of money, and if it -- if your client is trying to get you to do something that is contrary to the law, maybe make a little less money and don't represent that client.

**MS. CHEUNG:** I agree that it is absolutely --

**THE COURT:** But it's also the client's fault. I mean, Apple has a lot of lawyers, and Apple has a responsibility to be familiar with the rules of sealing. The courts are paid for by the public, and Apple is a repeat user of our court system, and Apple and its in-house lawyers have a responsibility to understand the rules of sealing and to respect the public's right to information.

**MS. CHEUNG:** Understood, Your Honor, and completely agree.

And I also, on behalf of Apple, will say that Apple also understands the importance of public disclosure and narrowly tailored sealing, and so this is why I am saying we did not intend to suggest that the sealing requests were not overbroad, because they absolutely were. So I want to make that clear.

With respect to our response, the intent was that there are very, very discrete portions of some of the documents that we do think are appropriate to be sealed. For example, with respect to the unwanted tracking logic for the AirTag, that is not public. To the extent that that information would actually

help other people evade the safety features that are incorporated in the tracker, we would respectfully --

**THE COURT:** Can you give me a citation to something in the record that somebody could use to evade the tracking logic?

**MS. CHEUNG:** Sure, Your Honor. It's -- and without disclosing it, it's Docket Number 252-4. That's an example. And again, we -- it would be very narrowly tailored. We acknowledge that it is certainly not the entirety of the document, and it would be only a very small portion, and again, the responsibility is on me for not having redacted rather than wholesale sealing the entire document.

**THE COURT:** The responsibility is on you and Apple. So there are -- there's a possibility that there's a sliver of information in there that --

**MS. CHEUNG:** There is -- very small.

**THE COURT:** -- somebody could use to get around the protections that Apple has adopted to prevent tracking or detect tracking. And there's obviously, kind of, Plaintiffs' --

**MS. CHEUNG:** Exactly.

**THE COURT:** -- personal information.

**MS. CHEUNG:** Exactly.

**THE COURT:** So there's those two categories. Are there any other categories?

**MS. CHEUNG:** And then, you know, potentially also the

personal information of Apple employees, which we have previously had sealing motions granted --

**THE COURT:** Okay.

**MS. CHEUNG:** -- for those reasons as well. So as I said, Your Honor --

**THE COURT:** Anything else?

**MS. CHEUNG:** The other potential area that, again, we're thinking very hard about in light of the need to be as transparent as possible is potential features that are being considered for the future that are not currently in a product but would reveal plans for a potential future product.

And again, we would be very narrowly tailored if that were something that we would request. And I'm not saying for now. I know we have seven days and maybe seven days from your order. So early next week --

**THE COURT:** Seven days from my order.

**MS. CHEUNG:** -- to consider whether that's something we will be asking for, but that is another potential category, again, which would be very targeted and certainly not the entirety of any document. But it would be a targeted redaction.

**THE COURT:** Okay. I will -- I guess I will think about all that a little more before deciding on the sanctions question, and perhaps I'll wait and see what -- you know, see the narrowly -- the narrowed redaction request before I decide

on the sanctions question.

**MS. CHEUNG:** I do want to reiterate my apologies, Your Honor.

**THE COURT:** Okay. So let me turn, I guess, to the plaintiffs. Let's just take a step back before we get into the details of this, and let me just ask you. I tried to put myself in the shoes of a plaintiffs' lawyer, right, who was preparing to bring these cases.

And I'm imagining, like, the conversations I'd be having with my colleagues about, you know, this, and I feel fairly confident that what I would have said is: "There's no way that we are going to be able to proceed with this case as a class action. It makes a lot more sense to bring a bunch of individual cases."

I can't remember how many plaintiffs there were. Like, 41 originally?

**MR. SLADE:** 41 originally, yeah.

**THE COURT:** Yeah.

**MR. SLADE:** At their apex.

**THE COURT:** "And so we should bring -- you know, we should bring -- the Court's never going to certify a class. In addition, if we try to proceed with a class action, there's going to be a huge mess with choice of law questions and the question of whether we have standing to seek injunctive relief, and it's obvious we're not going to be able to get a class

certified with respect to causation, at a minimum.

"So let's do it the way most people are doing it now when we are talking about products liability cases. Let's bring a bunch of individual cases, and then to the extent that they are in other districts, we can, you know, potentially have the JPML consolidate the cases for pretrial purposes. As a matter of fact, if we try to bring this as a class action, we run the risk that the judge is going to immediately sever the plaintiffs, right, and rule that the plaintiffs are improperly joined."

So it seems to me pretty obvious that that was the way to go. And I'm just wondering why didn't you do that?

**MR. SLADE:** It's a great question, and --

**THE COURT:** I mean, let me add one point. That's what they did in the Uber sex assault cases. It seems -- these cases seem kind of analogous --

**MR. SLADE:** Sure.

**THE COURT:** -- to the Uber sex assault case, right, in that there are a number of common issues about, you know, what measures Uber should have taken to, you know, make sure that its drivers were not dangerous to passengers. There are, you know, legal questions potentially about whether the drivers are employees or independent contractors and things along those lines.

But it's so obvious that you can't bring a class action on

behalf of, you know, hundreds or thousands of people who were assaulted by Uber drivers, and so we're going to do them individually. Why didn't you take that approach here?

**MR. SLADE:** So there are a couple of reasons. This is an excellent question, and I'm very glad Your Honor asked that.

The first thing that I would say is there is one distinguishing factor with the Uber sex assault litigations and this case, which is in that instance, you know, the danger truly came from the driver, right?

And, you know, I understand that there is an underlying, you know, laxness in their review policies, but I think that that is more attenuated than the release of the AirTag, right, which is the sine qua non of the stalking. That said, that is debatable, and that's more of a causation thing that we can --

**THE COURT:** I don't -- I'm not sure I understand. I mean, the sine qua non of the stalking is the stalkers, just like the sine qua non of the sex assault is the drivers.

**MR. SLADE:** Fair. Fair. I would submit to you, though, that -- well, maybe my distinguishing is not as apt as I would think, but I want to get to the how we got here.

You know, originally, we conceived of this case very differently, right? We filed with two named plaintiffs, Ms. Hughes and Jane Doe 1. The idea of the class was, you know, different. We thought that this was a rifle shot CIPA case, for example.

**THE COURT:** Say that again?

**MR. SLADE:** We thought this was a rifle shot CIPA case, the California Invasion of Privacy Act subpart that involves utilizing a device to track people.

In working that up, we realized though there also was a negligence flavor to this and a products liability flavor to this and that this was -- there were things that could potentially, at the edges, be messier for a class treatment, but we felt like it was sensible to fold that in to see where things worked.

Now, in between the filing of the first complaint and the amended complaint, we paused for a while to try and see if we could settle with Apple on injunctive terms. During that time, we were contacted by, you know, roughly 39 other people.

And while we recognized at the time that it was a very, you know, outside-of-the-box way to approach this, these people also had stories that we thought were very compelling and sought representation and didn't necessarily have any other vehicle to achieve relief.

And so going against the instincts of a good class action plaintiffs' lawyer, we decided, "All right, let's bring these people in," recognizing that the more people you have in, the more variables you have, the messier things get.

This is also before we had the benefit of the Court's first motion to dismiss order, right? After that time in

December of that year, we had our hearing, at which point I learned in no uncertain terms the CIPA claim was going to be a dead letter and that really, you know, where this was going to go was much more a place where the individuals were going to seek their damages, and there was a world in which potentially an injunctive relief class could be certified. And that, honestly, has been how we've thought of it ever since.

And, you know, our injunctive goal is rifle shot, we would argue, or we would believe that there is a --

**THE COURT:** Well, you're not going to get injunctive relief.

**MR. SLADE:** Understood.

**THE COURT:** Plaintiffs don't have standing to seek injunctive relief.

**MR. SLADE:** Okay.

**THE COURT:** I don't even need to hear argument about that.

**MR. SLADE:** Fair enough.

**THE COURT:** That's --

**MR. SLADE:** Fair enough.

**THE COURT:** But anyway, go ahead.

**MR. SLADE:** Okay. Well, in that case, that was our goal. And that -- you know, that was certainly our hope and our aim.

From that point though, this has very clearly become a

mini mass tort. You know, it has. Now, we couldn't have filed in a bunch of different venues at the time because when we filed this case originally, we simply didn't have these people as clients.

And then, you know, we were over -- about a year in or more before we realized, you know, the Court's view of this was that the CIPA claims were untenable and that, you know, what we saw as the driver of the class piece was, you know, not what this case was going to be about.

And so, you know, it would not have made sense, particularly since the Court indicated that it had no desire or did not indicate to us that it intended to sever these people or felt that they were fraudulently joined, it would not make sense to then sort of dismiss --

**THE COURT:** Well, just to be clear, I would never say fraudulently.

**MR. SLADE:** Or improperly. Sorry. Yeah, yeah. The one that we fear is fraudulent joinder, so it lurks behind us.

But, you know, to that end, it wouldn't have aided judicial economy for us to then atomize our existing case to all of these other jurisdictions only then to more likely than not, seek to consolidate them once again. And since the Court didn't have any apprehension about it, it just made sense for everyone to go forward.

Also, just from an efficiency standpoint --

**THE COURT:** Just to be clear, I did have an apprehension about it, and I think I indicated to you very early on, I don't see how this possibly could ever be certified as a class action.

**MR. SLADE:** Understood, Your Honor, although I will say --

**THE COURT:** Although I will say that I did not give thought to whether the plaintiffs were improperly joined, right?

**MR. SLADE:** Right.

**THE COURT:** And it seems to me, on reflection, they were improperly joined. And I'm not blaming you --

**MR. SLADE:** No, no, no. Of course.

**THE COURT:** That they were improperly joined, and had Apple filed a motion to sever, I would have granted that.

**MR. SLADE:** Sure.

**THE COURT:** And said that these cannot -- you know, these are separate, just like the Uber cases. Again, these are separate lawsuits.

**MR. SLADE:** Sure.

**THE COURT:** Separate disputes.

**MR. SLADE:** Sure, and I sympathize with that. You know, at the time, and up until maybe five minutes ago, I was hoping against hope that we could persuade Your Honor that common evidence would yield common answers for, you know, a

host of these people, if not all of them, largely because --

**THE COURT:** Well, I mean on the injunctive relief, one of the biggest problems is the standing issue.

**MR. SLADE:** Sure.

**THE COURT:** You can talk a little bit more about the C4 class.

**MR. SLADE:** Sure. Sure.

And to that end too, you know, again, this is me hoping against hope because C4 classes being granted are hen's teeth rare. But it did seem like this would be a good one at least because, you know, moving forward, multiple people are going to go to trial here, right?

And I don't know if we do it as bellwethers. I don't know if we find out what to do jointly. But, you know, assuming that we prevail enough to be able to deliver opening arguments to the jury, it seems as though judicial economy would be served well by deciding duty and breach on the front end or, you know, things along those lines and then figuring, you know, that will also greatly expedite multiple individual trials.

**THE COURT:** But let me ask you a question about that. I mean, I took a bunch of notes --

**MR. SLADE:** Sure.

**THE COURT:** -- and I have a bunch of questions about what you said, but the issue of deciding duty and breach at the front end, on one level, I understand what you're saying, but

on another level, if this had proceeded with a bunch of individual cases, regardless of whether you filed them all around the country in the plaintiffs' home districts or whether you filed them all in the Northern District of California, right, the cases presumably would have been put in front of one judge for pretrial purposes, and the judge could have -- let's say it's an MDL, right?

The judge could have decided the issue of duty and breach, and it would have applied to all of the plaintiffs. So I don't -- proceeding with a class action doesn't get you any advantage in that regard.

**MR. SLADE:** Absolutely. And again, like I said, as I said earlier, we've sort of sleepwalked into a world that is much more like a mass tort and something that is MDL'd, right, than -- this isn't us trying to do an end run around the JPML or anything. It's just because of the timing and because of the fact that the case evolved pretty significantly in medias res, we are simply where we are.

So part of this is us trying to figure out ways to consolidate certain pretrial issues of law. And, you know, the C4 class seemed like a good vehicle to do that. I don't believe that it's the only one, right?

I mean, you know, if, at the end of today, there are no classes certified -- and it sounds like that is the way things are going -- I still would submit to Your Honor that, you know,

subsequent case management plans, we should try and identify how much we can efficiently sort of, you know, overlap in the Venn diagram of all of the plaintiffs and their legal issues so that, you know, subsequent trials, should they take place, are, you know, run smoothly.

But I reiterate you're absolutely right that, like, you know, based on where the case is right now, sitting here today, it looks a lot like --

**THE COURT:** A mass tort.

**MR. SLADE:** -- an MDL. Right.

**THE COURT:** Why does it have to be a mini mass tort? I mean, you --

**MR. SLADE:** Well, these are --

**THE COURT:** You talk a lot about numerosity and -- right? I agree with you. Like, that's one --

**MR. SLADE:** Right.

**THE COURT:** -- part of the certification requirement that I think you have satisfied.

**MR. SLADE:** In spades.

**THE COURT:** The numerosity requirement. But why would it be a mini mass tort as opposed to a mass tort?

**MR. SLADE:** And you ask an excellent question. I promised my mother long ago that I would never be a mass torts lawyer, but I may have to go back on my word. There is a world, right, in which this does get much larger.

I am just thinking about the people that, sitting here today, who I know, right, who I have a retainer agreement with and represent who we are trying to work up towards trial. So I'm just -- you know, I can walk and chew gum at the same time, but what you are envisioning is not an impossible outcome, I will say.

**THE COURT:** Okay. And another comment that you made earlier on was that you were looking at these individuals, these 41 individuals or however many, and they -- you know, they may not have had other means for seeking relief other than proceeding with this proposed class action.

And I guess, like the Uber cases, I don't quite get that, right, because this is not like a -- you know, this is not like a consumer class action where you're entitled to a partial refund for the product you bought because there's a misrepresentation on the label or something like that, right, where you could only recover ten bucks or something, right?

Every individual plaintiff in this case, if they can establish that Apple had a duty to them and that Apple breached the duty and that it caused harm to them in the form of being terrorized by a stalker, right? And they could recover a lot of money from that.

**MR. SLADE:** And you're absolutely right, Your Honor. And it's not that we didn't believe that if they hunted, they could find other counsel potentially. It's that we believed

that we could be good counsel to them, and we could litigate their individual damages claims and not extinguish those, right, through the mechanism of the existing case.

**THE COURT:** Right, but --

**MR. SLADE:** But at the time, we did believe, you know, that there was a world in which we could concurrently get injunctive relief on their behalf and the behalf of everyone else through the B2 class. So, you know, we perceived of a B2 class and then, you know, a damages trial for each of the plaintiffs.

**THE COURT:** Okay. Let me ask you. The other comment you made was that, you know, C4 classes, issues classes are very rare. I tend to think that they're too rare, and I tend to think that we judges and lawyers don't explore the possibility of certifying C4 classes as much as we should.

So I want to have a discussion about whether it would make sense to have a C4 class in this case, but I guess my view of it is that even though we should be -- even though we should be doing that more and considering that more, this still doesn't seem like the right case for it. And I want to give you just at least a few reasons why and then give you an opportunity to respond.

One is that we would be deciding so little, right? I mean, if it's just -- I think your best argument is for C4 class on duty and breach of duty, right? And we would be

deciding so little, you know, compared to what would need to be litigated and adjudicated in any individual plaintiff's case.

Number two, as I said earlier, right, it strikes me that there is a better mechanism, to the extent that it would be beneficial, to adjudicate those questions, you know, in front of one judge, and, you know, as to all of the individuals at the same time, there's another mechanism for doing that, and that is, you know, the mass tort mechanism.

**MR. SLADE:** Right.

**THE COURT:** The MDL mechanism, or if all cases are within the district, you know, a mini MDL within the district, which we here in the Northern District of California do all the time. And that seems like a far superior mechanism for adjudicating the cases.

You know, in addition, you have all these very difficult choice of law questions, and I think the best -- candidly, the best that you could hope for is -- and I don't know that this would be the ruling, but I think the best case scenario for you is -- okay.

You know, for the people who signed these agreements, right, the terms of service or the licensing agreement, any claim about a defect that involves their use of the software or the operation of the software or their inability to use the software would be governed by California law.

But any claim that does not involve the use of the

software or the functioning of the software or their inability to use the software would, under a proper choice of law analysis, almost certainly be governed by the law of the plaintiff's home state, right? And so with the C4 class, we'd have all these complicated questions about which state's law applies to which members of the class.

And it strikes me that that's another reason why, you know, a C4 class is not particularly manageable in this case, and I think the question of which law applies and what that law is hasn't really been teed up very well in this motion for class certification, and, you know, it would make it a real mess, I would think, to try to proceed with a C4 class.

And again, my experience in the Roundup case is that, you know, differences between state laws are much easier to manage when you're doing -- when you're doing it as a mass tort as opposed to a class because then you can say, "All right. We're going to decide the North Carolina plaintiffs now," and "We're going to decide the West Virginia plaintiffs now and whether there was a duty to the North Carolina and the West Virginia plaintiffs."

**MR. SLADE:** Sure.

**THE COURT:** So I just -- I think it seems like there are -- and there are probably other reasons I'm not thinking of, but it seems like there are a whole host of reasons why, particularly given that there's no way that you can get an

injunctive relief class certified, to then, you know, proceed with a C4 class on these particular facts in this particular procedural posture seems like it is not the best way to go, let's say.

**MR. SLADE:** Heard and understood. I mean, you know, I would certainly -- I would love to try and tee up and, you know, hopefully be more persuasive on the choice of law and the interplay between the phone software and the AirTag and why it is, you know, a critical piece of how the AirTag functions. In the absence of the phone software, the AirTag cannot exist.

**THE COURT:** Well, what about the size of the AirTag?

**MR. SLADE:** What's that?

**THE COURT:** One of the complaints is about the size of the AirTag.

**MR. SLADE:** Certainly, right. And I am sympathetic to that. But the size of the AirTag, it being very hard to find, again, would be immaterial if the software didn't exist because the AirTag would just be a dead rock, right? But that said, setting aside the choice of law issue -- and let's just go to the hypothetical that you have put forward.

You know, what you describe from the MDL process, right, sounds very similar to what, you know, briefing on some of these C4 issues might be, right? We would still need to delineate what the claims are of the people in the different states outside of the pieces that touch on California law and

duty and breach.

But at the same time, there is value, you know, nonetheless in figuring out those issues. I mean, not for nothing because they're also California plaintiffs, right, who California law unambiguously is going to apply to the entirety of their claims.

So, you know, I'm not saying -- in a way, I think what the Court is possibly saying, but I don't want to misread this, is that C4 certification is almost immaterial because we are going to be using the levers, the procedural levers that are available to us to try and achieve economies of scale for resolving as many legal issues as we can for people, and then to the extent that we can't, we'll take those a la carte.

So, you know, coming into this hearing, in many ways, you know, I've been scratching my head thinking, you know, is this -- I mean, even if we won certification, it would probably be a Pyrrhic victory because all we were doing, particularly in the C4 arena, is figuring out issues that we would figure out otherwise.

**THE COURT:** Yeah. In other words, it seems like this whole process for seeking certification has been a big waste of time for the plaintiffs and for other potential plaintiffs out there, you know, would-be class members who could otherwise have brought their individual cases.

**MR. SLADE:** So, you know, nothing is stopping any

individual from seeking their individual cases, right? We are not trying to elbow out or foreclose anybody from bringing their own damages case or bringing their own litigation. So, you know, to that end, I don't believe that we have created anything that has frozen anyone out, right?

So it's just --

**THE COURT:** Well, I know, but when a class action is pending, that has a tendency to, you know, cause people to decide to sit back and wait and see what happens.

**MR. SLADE:** Typically, I will say in this instance, it has caused a pretty rapid influx of calls to us. I mean, usually if you're the person driving the boat and somebody wants legal representation, they often reach out there. So, you know, if we thought in any way, shape, or form we were prohibiting people from exercising their legal rights, we would have remedied that. Our goal very much in this case is to take on all comers.

So, you know, to that end, I would push back on the idea that we are elbowing people out, but your point --

**THE COURT:** Oh, I never meant --

**MR. SLADE:** -- is for sure heard.

**THE COURT:** I never meant to suggest --

**MR. SLADE:** Or -- yeah.

**THE COURT:** -- that you were.

**MR. SLADE:** Yeah. Yeah.

In terms of whether or not this is a waste of time, of course, you know, you're only as funky as your last cut, and if you lose, then yes, it was not -- you know, time, objectively with the information that you have, could have been better spent.

But I will submit, you know, originally, at a different period in time, the Court seemed much more open to the idea of an injunctive certification, right, and even --

**THE COURT:** Yes.

**MR. SLADE:** -- asked the parties to stipulate to it. So it's not as if we were --

**THE COURT:** Understood. And that's why I say I'm not blaming you for any of this.

**MR. SLADE:** No, no.

**THE COURT:** And I -- you know, when I said what I said about injunctive relief, I just wasn't thinking about the standing issue.

**MR. SLADE:** Of course. Of course. And again, it's not -- certainly I'm not admonishing the Court about anything.

I'm just saying, you know, as we have been going through the class certification process, more and more and more internally in our firm, we realize what this case -- the main event of this case will be the trials, and it will be the individual trials, no matter what happens.

**THE COURT:** Ms. Cheung, can I ask you: Why didn't you

file a motion to sever the plaintiffs in the beginning of this case? When I'm looking back on it, right, I wish I would have sua sponte --

**MS. CHEUNG:** Yeah.

**THE COURT:** -- issued an order to show cause why the plaintiffs should not be severed. I think that would have --

**MS. CHEUNG:** It --

**THE COURT:** Had I done that, the case -- you know, the matter would have proceeded in a more efficient and effective way for everybody involved. Why didn't you file a motion to sever? It seems pretty clear in hindsight that the plaintiffs were improperly joined.

**MS. CHEUNG:** In hindsight, indeed. As we were -- you know, and it is disappointing to hear that, you know, as I think Plaintiffs put it, we've sleepwalked into this situation, and I agree that it's been a waste of time, not only for the plaintiffs and the Court, but also for Defendant.

But I think that the issue is -- and as we were actually working up our, you know, class certification briefing in our case, the issue of severance did come up in thinking about "Well, assuming that class certification is denied, which is what we expected would happen, we anticipated that at that point, motions to sever could be filed.

And maybe that's too little, too late. But in terms of what we were thinking, our thinking was that after class cert

denial, then at that point, the individual cases could go back to their home states, and we will have done, you know, some work jointly to do some coordinated discovery so we wouldn't be losing efficiencies there.

But at the point of denial, then the cases would at that point -- our plan was to move to sever.

**THE COURT:** Could I ask a question about your "back to home state" --

**MS. CHEUNG:** Yeah. Sure.

**THE COURT:** -- comment? I can't remember. I know that there's this choice of law provision in the licensing agreement and in the terms of service for the --

**MS. CHEUNG:** Tracker Detect.

**THE COURT:** I was going to say "stalker track."

**MS. CHEUNG:** No. I'm happy to help you.

**THE COURT:** But is there also a venue provision?

**MS. CHEUNG:** So that's a good question, Your Honor. I will say, though, that our view -- and we're happy to flesh this out some more -- is that the terms of service do not govern. So Tracker Detect, for one thing, is no longer in existence.

**THE COURT:** I understand your position that the terms of service do not govern, and that -- you know, we can talk about that more, but I was just curious. There's the terms of service, and there's the license agreement, right? So let's

talk about the license agreement, right? Because as you've pointed out, the terms of service argument is a new argument. But let's just talk about the license agreement.

Is there a venue provision in the license agreement? Because if there were, right, then there would be this question of whether the lawsuit needs to be after severance. Let's assume that I deny certification and I sever the plaintiffs. Then there would be a question of whether some of the plaintiffs would need to be transferred to their home states or whether some venue provision would require the lawsuits to be here.

**MS. CHEUNG:** Yeah, and to the extent, Your Honor -- and to answer your direct question, I need to go double-check the license agreements because I'm not sure.

But to the extent that the license agreement does apply, there -- and again, we have a lot of arguments as to why governmental interest test should apply, and because of that, the IOS agreement does not govern. But if it did govern and California law applied, then we would expect that it would proceed here.

**THE COURT:** I mean, I -- my inclination is that it has to be that some of these -- I mean, there's the question of -- there's the choice of law question, and there's the venue question, right? But even if North Carolina law applies --

**MS. CHEUNG:** Right.

**THE COURT:** -- or the law of other states applied to at least some of these claims -- and I think the answer is they have to, right?

It has to be that with respect to some of these class members -- some of these plaintiffs for at least some of the claims, it has to be the law of the home state because the home state has such a greater interest in, you know, the outcome of the dispute than California does.

But one could still have a venue provision that requires the lawsuit to be brought in California, even if law of North Carolina applies, right?

**MS. CHEUNG:** No, that's correct, Your Honor. And again, that would only apply to a subset of the plaintiffs at issue here because many of them, you know, did not sign the IOS terms or the Tracker Detect terms.

We believe the Tracker Detect terms do not apply at all, given that Tracker Detect is no longer in existence, and some of the class members didn't even download the app until after the alleged incident.

So there are a lot of reasons, and again, we can flesh this out more, why we don't -- there's going to be a significant portion, we think, of the plaintiffs that we have now in this case that will not properly be joined in this jurisdiction.

**MR. SLADE:** If I may ask a question though, you know,

in the event of severance -- and this is not a rhetorical question. This is strictly from a place of ignorance.

If the plaintiffs were severed, given that Apple is subject to general jurisdiction in California, I mean, it's not, you know, inevitable that they would, say, go to North Carolina, right? I mean, it's just as sensible for them to file -- and they have just --

**THE COURT:** Yeah.

**MR. SLADE:** -- as much of a right, so --

**THE COURT:** No. I think you're right about that. The question would be --

**MR. SLADE:** Right.

**THE COURT:** -- whether the case is -- I don't think it would be a question of lack of jurisdiction.

**MR. SLADE:** Right.

**THE COURT:** -- or even probably improper venue.

**MR. SLADE:** Right.

**THE COURT:** Right? It would be a question of whether the cases should be transferred under the 1404(a).

**MR. SLADE:** Sure. And, you know, Your Honor, it sounds like -- and I could be wrong. I could be reading the room wrong, but it sounds like you are thinking along the lines of something that would ultimately be a mini MDL in Northern District of California.

And so my question is, you know, for case management

purposes, is that simply how we should just start thinking about proceeding?

**THE COURT:** Maybe. I mean, I'm thinking back to a case that I had a long time ago -- I can't believe I was on the bench a long time ago, but I guess I was.

**MR. SLADE:** Time comes for us all.

**THE COURT:** So I think it was about ten years ago, there was a -- I had a -- there was this lawsuit against United Airlines, and it was brought by around 23 pilots, if I remember correctly, alleging race discrimination.

And one of the plaintiffs -- it was all part of one case, right? There were 23 plaintiffs in this one lawsuit, and the case was stuck at the pleading stage for awhile, but ultimately the judge -- I don't even remember who it was, but the judge said, "These cases need to be severed. The plaintiffs are improperly joined."

And so then what happened was the plaintiffs had to file 23 new complaints, and they filed them in the Northern District of California, right? So 23 new complaints are filed in the Northern District. They were assigned to a bunch of judges, right?

**MR. SLADE:** Right.

**THE COURT:** And then I made the grave mistake, being a new judge, of volunteering to take all of those cases, to relate all of those cases to me. And so I had all 23 of them,

and the next thing that happened was a bunch -- United filed a bunch of motions to transfer, and -- under 1404(a).

I don't think there was a question of lack of jurisdiction or improper venue, but United filed a motion to transfer, a bunch of motions to transfer, and I granted a bunch of those and denied a bunch of those. And then so then there were -- you know, about half the cases were spread around the country, and half the cases were in front of me. And, you know, nobody went to the JPML, but if that's what happened here, then obviously anybody could go to the JPML and ask for an MDL to be created.

And that is extremely annoying, right? That's a lot of process to get us almost where we are now, but we do have rules, and the rules matter, and, you know, we need to adjudicate these cases properly.

**MR. SLADE:** And to that end, right, you know, certainly to the extent there is a way to do an end run around strictly another procedural tee-up that, you know, will take months, if not longer, I would love to. But that said, if that's not in the cards, it's not in the cards.

**THE COURT:** And the answer might be that, you know, Apple could file motions to transfer --

**MR. SLADE:** Sure.

**THE COURT:** -- or they could decide not to, and I would deny them.

**MR. SLADE:** Sure.

**THE COURT:** Or Apple could decide not to file --

**MR. SLADE:** Right.

**THE COURT:** -- motions to transfer.

**MR. SLADE:** Right. Would --

**THE COURT:** But if -- what I will say is if we go this route, right? If this is how we proceed and if I deny the -- and I want to go back and think about all this after the hearing.

But if we -- if I deny the motion for class certification and then sever the plaintiffs and then you file your individual complaints in the Northern District of California, I will certainly volunteer to have all the cases related to me so there's not this inefficient process of 10 or 15 different judges in the district adjudicating these cases.

**MR. SLADE:** We would be grateful for that, Your Honor.

**THE COURT:** I don't know. Maybe after this hearing, you would not be.

**MR. SLADE:** In for a penny, in for a pound.

**THE COURT:** So -- okay. Anything you want to say about this?

**MS. CHEUNG:** Only that although there may not be a jurisdictional issue -- and I think you've already pointed this out, Your Honor, we, Apple, would need to consent to having all these cases here. Even if it were actually properly many of

these cases should be severed under 1404, we do think most of the witnesses will be in the home states where the plaintiffs live.

**THE COURT:** Well, I don't know if I would say that Apple would need to consent. I think as long as jurisdiction and venue are proper here, then Apple has every right to file a motion to transfer under 1404 --

**MS. CHEUNG:** Exactly. And that's --

**THE COURT:** -- and argue --

**MS. CHEUNG:** That's right.

**THE COURT:** -- that it's better litigated elsewhere, and I would, of course, decide that.

**MS. CHEUNG:** That's right, Your Honor. You know, I think that that -- we just wanted to make clear that we are not waiving our rights to do that.

Even though I understand that the plaintiffs would like to have an MDL, mini MDL in this district, we certainly have not followed the rules in order to have that happen. And, you know, we too believe in the rules and want to make sure that, you know, we do what's appropriate and also what's efficient.

**THE COURT:** Okay. Let me give it some further thought, and then I'll issue a ruling.

**MR. SLADE:** Thank you, Your Honor.

**MS. CHEUNG:** Thank you, Your Honor.

**THE COURT:** Thank you.

(The proceedings concluded at 10:20 A.M.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, March 10, 2025

________________________________________

April Wood Brott, CSR No. 13782